## UNITED STATES v. DUANE.
### Cr. No. 2236.

District Court, D. Nebraska,
Lincoln Division.
May 28, 1946.

460

James L. Brown, Asst. U.S. Atty., of Lincoln, Neb., for plaintiff.

B. J. Boyle and Fred S. White, both of Omaha, Neb., for defendant.

DELEHANT, District Judge.

The defendant is being prosecuted by information charging that, in violation of Title 27 U.S.C.A. § 223, on July 21, 1945, in Gage County, Nebraska, he attempted to import, bring, and transport a designated quantity of specifically described intoxicating liquor consisting only of commercial whiskey, into Kansas.[1]

He has moved for the return to him or the suppression as evidence against him in the case, of one 1939 DeSoto Coupe model automobile and some 937 pints of assorted tax paid whiskey seized from him after search of the automobile, immediately upon his arrest.[2] Other issues are presented in reference to the sufficiency of the informa-

tion. But this opinion is directed only to the motion to suppress.

Evidence has been received upon the issues thus made, which, together with comprehensive briefs of counsel, has been duly considered by the court. The court has concluded that the motion to suppress is not well taken and is entering an order denying and overruling it. Counsel are entitled, in the light of their competent presentation of their respective positions, to an orderly statement of the legal and factual considerations which underlie the ruling.

The arrest of the defendant was made, and the automobile and liquor were seized, by Newton Splawn, agent, and Elvin E. Cook, investigator of the United States Treasury Department, Bureau of Internal Revenue, Alcohol Tax Unit. Both actions were taken without a warrant for arrest or a search warrant.

The defendant's fundamental reliance is upon the Fourth Amendment to the Constitution of the United States, whose language is: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

While the immunities thus defined in the amendment are not to be accorded the status of a fetish and thereby to be allowed to intercept their rational analysis, they are at the very core of those safeguards that chiefly distinguish the status of the inhabitants of the United States from the position of those in nations which acknowledge no real individual rights to be secure from official denial or invasion. To the full extent

---

[1] The information sets out the prohibition by Kansas legislation of all sales and of all importation of liquor within the information's description. It likewise includes charges of the actual importation, bringing and transportation of the liquor into Kansas, and of assisting therein. But the plaintiff has signified its purpose to rely solely upon the offense referred to in the body of the memorandum. The crime charged is not a felony, but a misdemeanor.

[2] A similar motion is presented by the defendant to this action in a proceeding also pending in this court, brought by the United States of America, under Title 27 U.S.C.A. § 224, for the forfeiture of the automobile allegedly employed in the offense charged in this prosecution and of the liquor allegedly involved. See Civil Case No. 345, Lincoln Division, United States of America, Libelant, v. One 1939 DeSoto Coupe Automobile et al.*

\* No opinion.

of its protection, the amendment shields the guilty, equally with the innocent. Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas. 1915C, 1177; Angello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409; Kroska v. United States, 8 Cir., 51 F.2d 330; United States v. Keown, D.C.Ky., 19 F.Supp. 639. In fact, demonstration would not be difficult that the barrier of the amendment is raised to safeguard unquestioned violators of the law, far more frequently than for the protection of those who are innocent or even doubtfully guilty.

■ However, even by its own terms, the amendment forbids, not all searches and seizures, but only those that are unlawful. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790. And upon the same authority (267 U.S. page 149, 45 S.Ct. 284) it "is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens." See also United States v. Bell, D.C.Cal., 48 F.Supp. 986.

A distinction is to be made, not so much in principle as imperatively in practical application, in the administration of the amendment's immunities in respect of the several objects of its protection. In which course a somewhat different judicial and legislative attitude may be discerned in the treatment of searches of dwellings or other buildings on the one hand, and of vehicles on the other, a variation that has been and is being magnified with the development of transportation. Upon this theme, in Carroll v. United States, supra, after a comprehensive examination of earlier statutes, as well as decisions, upon the point, the court said (page 153 of 267 U.S., 45 S.Ct. 285, 69 L.Ed. 543, 39 A.L.R. 790), "We have made a somewhat extended reference to those statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between the search of a store, dwelling house or other structure in respect of which

a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." See also Pearson v. United States, 10 Cir., 150 F.2d 219; Brock v. United States, 8 Cir.. 12 F.2d 370.

■ It has already been observed that the present search and seizure were made without the authority of a search warrant. A warrant is not, and is not here claimed to be, a condition prerequisite to such action. But, to support a search and seizure by a federal officer without a valid warrant justification in the way of probable cause for the step must exist. "On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid." Carroll v. United States, supra, (page 149 of 267 U.S., 45 S.Ct. 283, 69 L.Ed. 543, 39 A.L.R. 790); Dumbra v. United States 268 U.S. 435, 45 S.Ct. 546, 69 L.Ed. 1032; Scher v. United States 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151; Garske v. United States, 8 Cir., 1 F.2d 620; Brock v. United States, 8 Cir., 12 F.2d 370; Peru v. United States, 8 Cir., 4 F.2d 881; Kroska v. United States, 8 Cir., supra; Kaiser v. United States, 8 Cir., 60 F.2d 410; Van Eeckhoute v. United States, 8 Cir., 79 F.2d 827; United States v. Costner, 6 Cir., 153 F.2d 23; Jones v. United States, 10 Cir., 131 F.2d 539; United States v. One 1937 Model Studebaker Sedan, 10 Cir., 96 F.2d 104; Alberty v. United States, 10 Cir., 134 F.2d 135; Pearson v. United States, supra; United States v. Keown, D.C.Ky., 19 F.Supp. 639; United States v. One 1929 Pierce Arrow Sedan, D.C.Mass., 8 F.Supp. 273.

■ It is made clear upon the highest authority that the facts relied upon by the officer for his belief of guilt need not be legal evidence of the suspected offense. Thus, in Husty v. United States, 282 U.S.

462

694, at pages 700, 701, 51 St.Ct. 240, 241, 75 L.Ed. 629, 74 A.L.R. 1407, it is said: "To show probable cause it is not necessary that the arresting officer should have had before him legal evidence of the suspected illegal act. * * * It is enough if the apparent facts which have come to his attention are sufficient, in the circumstances, to lead a reasonably discreet and prudent man to believe that liquor is illegally possessed in the automobile to be searched." (That alone was enough to support the charge involved in the Husty case. More is required here.) See also Dumbra v. United States, supra; Carroll v. United States, supra; Stacey v. Emery, 97 U.S. 642, 24 L.Ed. 1035; Kaiser v. United States, 8 Cir., supra.

■ The defendant correctly contends that, in support of his belief that the law is being violated, the officer is limited to his knowledge with which he initiates the search and that he may not sustain it upon the basis of the discovery of what he seeks in an otherwise illegal search. The mere vindication of a suspicion or guess will not suffice.[3] Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L. Ed. 520; Carroll v. United States, supra; Brock v. United States, 8 Cir., supra; Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690; Wisniewski v. United States, 6 Cir., 47 F.2d 825; United States v. Clark, D.C.Mo., 29 F. Supp. 138; United States v. Sully, D.C.N. Y., 56 F.Supp. 942; United States v. Slusser, D.C.Ohio, 270 F. 818; United States v. One Kemper Radio, D.C.Cal., 8 F.Supp. 304.

Not pressed upon the court in the defendant's original and reply briefs, but suggested in the interrogation of witnesses up-

on the hearing, and finally adverted to in a voluntarily submitted rejoinder brief, is the suggestion that, since the officers informed the defendant of his arrest immediately before the search of the automobile, the search and seizure may not be examined solely upon their own merits but must be sustained or rejected in relation, and as mere incidents, to an antecedent arrest upon the charge of the commission of a misdemeanor. In a comparable context the Supreme Court rejected this argument in Carroll v. United States, supra (see pages 156, 157, 158, 159, of 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790). And this court is persuaded that the arrest itself was lawfully made under the prescribed rules upon that question recalled by Mr. Chief Justice Taft in the Carroll case (pages 156, 157 of 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790).[4]

■ However the rule governing the search and seizure without a warrant may be stated or limited, no single criterion or testing formula for its application may be devised. The issue in each case must be determined upon its own peculiar facts. Go-Bart Importing Co. v. United States, supra; Turner v. Camp, 5 Cir., 123 F.2d 840; In re Ginsberg, 2 Cir., 147 F.2d 749. The court, therefore, mentions the established facts leading up to the criticized search and seizure. And they are set down in the chronological sequence of their occurrence.

■ For some time prior to July 20, 1945, one Frank Ellsworth was known to Splawn and Cook to be a " liquor runner" and had been under the surveillance of Splawn and his associates in the unit. While Splawn and Cook, as witnesses upon

---

[3] Several opinions denounce as inadequate a mere "hunch".

[4] Peru v. United States, supra, and United States v. Setaro, D.C.Conn., 37 F. 2d 134, cited in this connection by the defendant in his rejoinder brief, are both opinions involving the intrusion by officers into private buildings. The Circuit Court of Appeals for the Eighth Circuit in the Peru case emphasized that point and relied upon the careful discussion by the Supreme Court in the Carroll case

of the distinction between searches of buildings and those of vehicles. In the Setaro case an automobile was also involved, but it was seized and searched in the private garage of its operator.

The court need not observe that it is quite uninfluenced by the citation of unreported and undocumented rulings upon motions in other cases, though they were made in this district or even by the writer hereof. Citations of that sort are wholly profitless here.

463

the hearing, disclosed no knowledge of actual liquor running by the defendant, he was known by them to be acquainted with Ellsworth for whom he had done some mechanical work upon automobiles in a basement garage in Omaha. On an automobile in that garage, one° or both of the witnesses had seen a license plate bearing the license number that was on the automobile involved in the present motion at the time of its seizure. In that garage also Splawn knew of the storage of automobiles that had been used in the carriage of liquor into forbidden territory.

On the evening of July 20, 1945, from about 8:45 or 9 o'clock until about 11:30 o'clock, Splawn was secreted upon the premises of one Barber immediately north of the suburban acreage residence of Ellsworth located on the west side of highway No. 73, at Florence, the most northerly part of the metropolitan area of Omaha. He was about two feet from the corner of the garage on the Ellsworth premises.[5] In that interval he kept under observation the Ellsworth place and the occurrences upon it. There was adequate illumination for observation, and he remained within hearing distance from the garage. At about 9 o'clock that evening, Spawn saw Ellsworth drive into his yard in a Cadillac automobile, alight, and go into his house, and, shortly thereafter, emerge from the house in company with one Mighell. Under Splawn's observation, Ellsworth and Mighell removed from the Cadillac car, and carried into the garage, a substantial number of cartons of the size and type of liquor cartons. At about 11 o'clock, the removal of the cartons having been finished, a conversation occurred between Ellsworth and Mighell in which the former said in substance that there were forty cases of pints and fifty cases of fifths[6] all of which would be there in the garage when Mighell should want them. At about the same time, Mighell locked the garage

with a chain and lock he had removed from a Ford Pick-up truck on the premises. The evening's activity having ended, Splawn left his post at some time between 11 and 11:30 o'clock. While Splawn alone made the close and detailed observation on that occasion, he was accompanied to the general scene by Cook and also by two other agents of the unit. They came in two automobiles, and Cook and the other two agents kept the general area under observation while Splawn was making his close inspection.

The next morning at between 4:30 and 5 o'clock, Cook and Splawn returned to the same general area, and stationing themselves on a graveled or dirt highway running north and south between one-fourth and one-half mile westerly from the Ellsworth home, kept the Ellsworth place under scrutiny through a field glass. Two other agents remained posted elsewhere in the vicinity. Visibility was clear and unimpeded. During the morning Splawn and Cook saw Ellsworth and two women (whom they recognized not by name but as companions of Ellsworth on earlier calls at various liquor stores in Omaha and at his residence) remove several empty cartons from the garage and pile and burn them nearby. At about 10 o'clock, Duane drove the coupe involved in this proceeding into the Ellsworth yard, had a brief conversation with Ellsworth and another man, and then backed the coupe into the garage, leaving its front portion projecting slightly through the open door. After about thirty minutes the coupe was driven out of the garage and stopped for a short period.

Then, Duane drove it out of the Ellsworth yard and into highway No. 73, on which he proceeded (with Splawn and Cook following him in their automobile), first, northerly some 28 miles to Blair; thence southwesterly about 15 miles on highway No. 30 to Kennard; thence westerly and southerly to highway No. 6, and

[5] The evidence negatives any possibility of his intrusion upon the Ellsworth grounds, for he remained on the Barber side of, but against, the partition fence.

[6] The defendant urges that the foregoing references to "pints" and "fifths" may have referred to innocent fluids equally as well as to intoxicating liquor. The contention is without merit. The terms, especially in association with each other, are a recognized part of the "language of the trade", at least in their actual setting.

on it to Gretna,[7] where he stopped at a service station. Splawn and Cook did not stop at Gretna, but proceeded on south-westerly to Ashland where they stopped and awaited Duane who came along in the coupe in the course of about thirty minutes. Splawn and Cook resumed their pursuit of him through Lincoln and thence on highway No. 77 to Beatrice. At the principal street intersection in Beatrice Duane turned west, proceeded about three blocks, and parked his automobile on the north side of the street. Beatrice is about 18 miles north of the Kansas state line, and about 21 and 22 miles distant from that line on two separate traveled highways.

The journey of 28 miles from the Ells-worth place to Blair with the necessity of duplicating that mileage was in the direction precisely opposite to the course of travel ultimately pursued by Duane, for the di-rect route from the Ellsworth residence to Beatrice leads south and then westerly and southerly. As Cook and Splawn kept the Duane automobile under observation they saw that its rear end sagged, and no-ticed that fact particularly when it passed over an obstacle or ditch in the road, and also while they could see it laterally. At no time on the journey or when the Duane car was parked at Beatrice could any liquor be seen in the car.

When Duane parked his automobile in Beatrice, Cook and Splawn stopped, ap-proached him, identified themselves, placed him under arrest, and asked him how much liquor was in his car. Duane replied that there was none. Splawn asked him for his key, whereupon Duane acknowledged that he had forty cases and surrendered his key. The search followed, disclosing about forty cases of whiskey wrapped in paper lugs, varying in size according to the number and sizes of the bottles they respectively contained. In the car none of the liquor was packaged in cartons. The car and its contents were seized.

Under the cited applicable law, and with the factual knowledge just noted, the court can conclude only that, at the time of the search and seizure, Splawn and Cook were possessed of such information—such actual knowledge—as would cause a reasonably discreet and prudent person to believe that the Duane coupe was then and there being used in an attempt by Duane to transport whiskey into Kansas in violation of the statute under which this action is brought. And that, by the agreement of both parties, is the legal test of their right to search and seize the car without a warrant. The court might note here the particulars by which it considers that by far the greater num-ber of the cases cited by the defendant in his briefs may be distinguished from the situation which this ruling involves. But no actual service would be performed by such a discussion. It may be acknowledged that in certain instances a factual distinc-tion of cited opinions from the present case may not be made with assurance and cer-tainty. But that is not a controlling cir-cumstance. The ruling conforms to the practice in the manifest majority of re-ported opinions dealing with the question.

The court is prepared to agree with the defendant's contention that in the present case, information adequate to warrant the belief that the automobile contained whis-key is not enough. The mere possession in a vehicle of the whiskey in Nebraska is not an offense against a federal statute.[8] The information must also justify the belief that Duane was there and then attempting to transport the liquor into Kansas. The defendant argues vigorously but not persua-sively that it fails in that behalf.

Without unnecessary citation from them, the questions of distance and direction from Kansas seem to be controlled in this cir-cuit by the fairly recent cases of Gregg v. United States 8 Cir., 113 F.2d 687, and Daniel v. United States, 8 Cir., 127 F.2d 1. It is, indeed, suggested that the authority

[7] The court takes note of a manifest, but not significant, error of fact in the testimony. It is said that from Ken-nard, Duane proceeded west on a grav-eled road to highway No. 6. But that would be quite impossible. Kennard is substantially north of any point in Ne-braska on highway No. 6. So, it is con-cluded simply that the defendant pro-ceeded from Kennard to Gretna, reach-ing the latter point on highway No. 6.

[8] No question of the payment of fed-eral tax or evasion of revenue is in-volved.

of the former of those cases was impaired by the later action of the Circuit Court of Appeals upon rehearing in Gregg v. United States, 8 Cir., 116 F.2d 609; but a sufficient answer seems to be that the circuit court evidently thinks otherwise; for it relied upon the earlier Gregg opinion as authority for the ruling in the Daniel case. The defendant professes to see a factual distinction between his plight and those of Gregg and Daniel. But the differences are at most only details of degree.

Nor is there decisive virtue in the argument that on reaching Beatrice, Duane had turned westerly off highway No. 77 that leads into Kansas, and was accosted by Splawn and Cook while he was at rest and on a street that does not lead to Kansas. When he was arrested, he was on a highway from which many intersecting roads proceed into Kansas, notably one just three miles westerly from Beatrice, leading to Washington, Kansas, another proceeding south from Fairbury, and the well-known highway No. 81 departing near Hebron for Belleville, Concordia, Minneapolis, Salina, and Wichita, as well as many intermediate points, in Kansas. And those are only a few of the available routes which include both improved highways and less frequented casual roads intersecting the interstate boundary.